No. 13,369.

WILLIAM B. BOOTH (R. S. BOOTH, SUBROGATED), VS. CYPRIEN BURAS.

SYLLABUS.

1. Whilst, in an action of boundary, a party may be deprived, by reason of the exhibition of a stronger title, of some portion of the land claimed by him, he can, under no circumstances, demand, as the result of such action, that his boundaries be extended beyond the limits fixed by the only title upon which he declares.

2. Where a Spanish grant describes the property, which lies upon the Mississippi and extends back to the sea marsh, as "about two leagues," from one bayou, the name of which is given, to another bayou, the name of which is also given, the grant is *per aversionem,* and the boundaries thus named control the superficial and lineal measurement.

3. Where in the course of the trial of an action of boundary the parties litigant fail to establish title to contiguous tracts, or bodies, of land, the action will be dismissed.

APPEAL from the Twenty-Second Judicial District, Parish of Plaquemine—*Hingle, J.*

*John Dymond, Jr.,* for Plaintiff, Appellee.

*James Wilkinson* and *E. Howard McCaleb* for Defendant, Appellant.

The opinion of the court was delivered by MONROE, J.

STATEMENT OF THE CASE.

MONROE, J.   This action was brought in 1869 for the purpose of establishing the boundary between certain tracts of land owned by the plaintiff and defendants, respectively, and which were said to lie contiguous to each other in the parish of Plaquemine.   Since the filing of the suit, Wm. B. Booth has died, and is now represented herein by R. S. Booth, his universal legatee.   Jean Pierre Buras, one of the original defendants, has also died, and his widow and heirs were made parties, but they have not appealed from the judgment which is here complained of, and are not now before the court.   The present parties to the litigation are, therefore, R. S. Booth, plaintiff, and Cyprien Buras, defendant.   It appears from the record, that, in December, 1794, Anthony de St. Maxent, formerly a captain in the Spanish service, pre-

sented a petition to Baron de Carondelet, the Spanish Governor General of Louisiana, setting forth that he wished to establish a plantation on the Mississippi river, and asking for a grant of "the land lying between Bayou Liards and the one called Carencro, two leagues apart from each other, but containing only three arpents in depth good for cultivation", with a reservation to the government of the land "in the middle of this space", occupied by, and surrounding, Fort Bourbon. And the grant was made and the land "about two leagues from Bayou Liard to that of Carencro" ordered to be surveyed, though the particular survey made pursuant to this order, if any there was, has not been produced for the purposes of this case. After the acquisition of Louisiana by the United States, the grant thus made was confirmed by commissioners, pursuant to authority conferred by an Act of Congress of 1807, in the following terms, to-wit:

"James Smith and Harris Hove claim a tract of land situated in the " county of Orleans on the right bank of the Mississippi river contain- " ing 6624 superficial arpents, and 584 toises, bounded on the upper " side by Bayou Liard, and on the lower, by the Bayou Carencro. It " appears that an order of survey for said land was duly issued by the " Baron de Carondelet, in favor of Anthony de St. Maxent, from whom " the claimants derive their title, dated the 14th of January, 1795, " which the Board do hereby confirm, agreeably to the terms and condi- " tions specified in the petition, reserving to the United States, the " ground within two hundred toises, of Fort Bourbon." ,

Thereafter, in 1847, a patent was issued, which, after referring to the grant to de St. Maxent and the confirmation to Smith and Hove, proceeds to recite that the claim in question has been surveyed as containing 5575 41-100 acres "and has been designated as section thirty- " five in township twenty, South, of Range thirty, East; and Section " four in township twenty-one, South, of Range thirty East, lying west " of the Mississippi river", etc., and makes the grant of "*the sections of land* above described", excepting that reserved for the fort, etc. And it is under this title that the plaintiff claims.

The title of the defendant, upon the other hand, to so much of the land claimed by him, as is said to lie contiguous to that claimed by the plaintiff, to-wit: fractional sections 32, 33 and 34 in township twenty, South, of Range thirty, East, traces back to a patent issued by the State of Louisiana to Effingham Lawrence in 1855, based upon a warrant issued on the authority of an Act of the Legislature of March 17, 1852; whilst the title to the remaining lots claimed by the defendant

traces back to a United States patent issued in 1844; the whole tract claimed by defendant having been acquired by him immediately from his co-defendant, Jean Pierre Buras, by an act of sale, dated Feb. 2, 1866, which describes, and undertakes to identify the property as follows, to-wit:

"1st. Lots, or fractional sections Nos. 32, 33 and 34 in township "No. twenty, South, of range No. thirty, East, in the South Eastern "land district of Louisiana, West of the Mississippi river, containing "by estimation one hundred and twenty-two superficial acres, according "to the official plat of the survey of said lands, returned in the State "Land Office of this State."

"2nd. Lots, or sections Two and Three in township twenty-one, "West of the Mississippi river, of range thirty, East, in the district of "land, subject to sale at New Orleans, La., containing 60 acres, and "84-100 of an acre, according to the official plat of the survey of the "said lands, returned to the General Land Office by the Surveyor General."

"3rd. Lot No. One in township No. Twenty-one, of range thirty- "one, East, in the district of land subject to sale at New Orleans, La., "according to the official plat of the survey of the said lands, returned "to the General Land Office by the Surveyor General, and which all "said lots or sections herein conveyed form a front of forty arpents on "the Mississippi river, as the whole is set down on the survey of said "lands, made by Hawke, civil engineer, on the 2nd and 3rd of Novem- "ber, 1866, and hereunto annexed for reference."

In 1869, when Wm. B. Booth brought this action, the defendants, Jean Pierre, and Cyprien Buras, filed an answer, in which they denied the allegation that they had refused to allow the boundary to be established extra-judicially, and from which we make the following extract:
"They, on the contrary, positively aver as follows, to-wit:on the twenty- "fourth day of October, 1866, and at the request of Jean Pierre Buras, "a civil engineer and sworn surveyor of the State, to-wit, Maurice "Hawke" (was employed, and) "the said Wm. B. Booth, plaintiff herein, "was personally notified in writing that on Monday the 29th of October, "1866, the said surveyor would proceed to survey said lands, and fix "the boundaries thereof. Pursuant to said notice, served as aforesaid "on said Booth, and to said request of Jean Pierre Buras, the said "surveyor on the 29th of October, 1866, repaired to said place, and "then and there performed his work, which lasted five days, to-wit, the "29th, 30th and 31st of October, and the 2nd and 3rd days of Novem-

" ber, 1866. That the said Booth, although duly notified as aforesaid
" to be present, did not judge proper to appear, nor to send anybody
" then and there to represent him, to make opposition thereto, said sur-
" veyor consequently went on with his said operation in the presence
" of two witnesses, called for that purpose—made also in their presence
" his *proces verbal* thereof, which they signed with him, and made a
" record of his proceedings, and of the plan drawn by him, as more fully
" appears from a duly certified copy of said *proces verbal,* hereunto an-
" nexed and made a part of this petition, and of the plan deposited in
" the recorder's office of this parish, which will be produced, if neces-
" sary, on the day of trial. Respondents further aver, that under said
" circumstances, said plaintiff has no other course to pursue, except to
" ask for a ratification of said operation, if he thinks it proper for his
" interest, but not to institute a suit to pray for a survey and fixing of
" boundaries which has already been made, in accordance with the
" requisites of law. Wherefore, respondents pray that he —— (plain-
" tiff) be cited to appear and show cause why the said survey and fixing
" of boundaries, should not be confirmed and made conclusive between
" them and him," etc.

The *proces verbal* thus referred to and made part of defendants'
pleadings, in so far as it is necessary to quote it, reads as follows, to-
wit: "Mr. Jean Pierre Buras —— wishing to have established the
" boundaries of a certain tract of land owned by him in township Nos.
" 20 and 21, South, range 31, East, as well as in township 21, South,
" range 31, East, as well as in township 21, South, range 31, East,
" South-Eastern Land District of Louisiana, and below the claim of
" Smith and Hove (Old Board No. 362) he required my professional
" services for that purpose."

" No traces existing on the ground of the lower line of the aforesaid
" claim of Smith and Hove, and the Bayou Carencro, given in the
" grant as its lower boundary, being not contiguous to the Mississippi,
" it was necessary to establish that line, by surveying the whole front,
" from its upper boundary, the Petit Bayou Liards."

The *proces verbal* then recites the survey of the entire front, as
claimed by both litigants, from the Bayou Liards, the upper boundary
of plaintiffs' land, to the "Jump," which lies below that claimed by the
defendants, and the establishment of the boundary between the two
tracts. It does not appear that the surveyor actually saw the Bayou
Carencro, but, referring to a point on the river front indicated in his

*proces verbal,* he says, "the Bayou Carencro is said to be in the rear of that point."

The plaintiff, however, objected to the survey thus tendered, upon several grounds, the main ground, upon the merits, being, that it did not give him all the land that he claimed, but deprived him of a mile front on the river. He also urged that he was not bound by said survey for the reason that he had not received timely notice. And he prayed for a new survey, or, in the alternative, for the rectification of that tendered by the defendants.

No action was taken by the court upon the subject of the survey, the correctness and sufficiency of which were thus asserted by the defendant and denied by the plaintiff, but the parties litigant agreed each to name a surveyor, who, together with the surveyor named by the other, should make a new survey and designate the boundary. And, in the event of their non-concurrence, it was agreed that an umpire should be appointed by the court. The plaintiff thereupon named V. Sulakowski and the defendant named W. J. McCulloh, and those gentlemen made a survey and agreed upon a report, whereby they placed the boundary line between the respective estates at a point about five thirty-seconds of a mile further on the land of the defendants than Hawke, by whom the previous survey had been made, had placed it. In their *proces verbal,* however, these gentlemen say, among other things, "found no Bayou Carencro, nor anything resembling a bayou". The plaintiff moved that this report be adopted, and the defendants opposed its adoption, and there was judgment, in April, 1872, sustaining the opposition and ordering a new survey to be made by C. F. Berens, surveyor. Mr. Berens, however, declined to serve, and C. Uncas Lewis was appointed in his place, and made a survey and report, the adoption of which was moved by the plaintiff and opposed by the defendant, with the result that the opposition was again sustained; and still another survey ordered. Upon May 10, 1876, the case, having been called for trial, was continued, upon plaintiff's application, on the ground that the survey, as ordered, had not been made, with the condition, however, that the plaintiff should see that it was made before the next calling under penalty of being non-suited. Upon the following day, the plaintiff, through his counsel, ruled the defendant to show cause why C. Uncas Lewis should not be ordered to make a new survey and establish the boundary in accordance with the original survey of the grant to plaintiff's author, which, it was alleged, was on file at the date of the grant subsequently made to defendant's author. There was judgment dismissing this rule,

the plaintiff appealed, and the judgment appealed from was reversed by this court. In the opinion upon which this decree is predicated, the court, through Chief Justice Bermudez, used the following language, to-wit: "* * * it is clear that as previous reports have not met with " the approval of the court, it is proper that the officer to be appointed " in future should be informed as to the course to be pursued by him in " his researches, finding and return, which does not appear to have been · " done heretofore. We feel that it is our duty to say that the lands " claimed by plaintiff on the right bank of the river, containing sixty- " six hundred and twenty-four (6624) superficial arpents, and five hun- " dred and eighty-four toises, must be found bounded by Bayou Liards, " on the upper side, and by Bayou Carencro on the lower side."

In view of this expression and of the fact that the location of Bayou Liards, the upper boundary of the plaintiff's land, has never been in dispute, it would appear that the only question to be investigated, after the rendition of the judgment thus referred to, was the location of Bayou Carencro, as the lower boundary, separating plaintiff's land from that of the defendant's.

The original plaintiff, Wm. B. Booth, seemed indisposed, however, to prosecute this inquiry, and no further steps were taken in the cause until March, 1898 (about three years after his death), when Cyprien Buras, the surviving, original defendant, filed a petition praying that R. S. Booth, the universal legatee of the original plaintiff, be made party to the suit, and that, in conformity to the decree of this court, " C. Uncas Lewis be appointed surveyor herein and directed to locate " and find the land claimed by plaintiff on the right bank of the Mis- " sippi river, containing 6623 superficial arpents, and 584 toises, bound- " ed by Bayou Liards on the upper side and Bayou Carencro on the " lower side, and that he be ordered to make a new survey and fix and " establish the boundary line between plaintiff's and defendants' prop- " erty". The order was made as prayed for, March 5th, 1898, but it was not complied with by the surveyor, and the defendant took no further steps in the matter. Thereupon, in November, 1898, the plain-tiff, R. S. Booth, through his attorney, ruled the defendant and the sur-veyor to show cause why the latter should not proceed as he had been directed. Upon the trial of this rule, it appeared that although Cyprien Buras had asked for the appointment of C. Uncas Lewis to make the survey, he was unwilling that he should do so, and refused to advance the money necessary for the actual expense thereof. The rule having

been made absolute, and the necessary funds having been advanced by the plaintiff, the survey was made, and duly reported to the court.

Thereupon, the plaintiff moved that it be approved, the defendant opposed, and there was a trial, resulting in a judgment for the plaintiff sustaining the report of the survey and fixing the boundary as established by him. And, from that judgment the defendant, Cyprien Buras, has appealed.

### OPINION.

Jean Pierre Buras, in 1896, employed Maurice Hawke, civil engineer and surveyor, to survey his property, including that now owned by the defendant, Cyprien Buras, and also that of the plaintiff, and to establish the boundary between them. Notice was given to Wm. B. Booth, the original plaintiff herein, who was invited to co-operate in the establishment of the boundary, but he failed to appear. Mr. Hawke, nevertheless, proceeded to make the survey, aided, presumably, by such suggestions and co-operation as Buras, who employed him, was able to afford, and he, eventually, reported his action by means of a map and *proces verbal.* The excerpt from this *proces verbal* already given, shows that the survey was begun at the Bayou Liard, the upper boundary of the Smith and Hove tract, and that the whole front of that tract and of the tract claimed by Buras were surveyed. The *proces verbal* further shows that the surveyor ascertained and established the desired boundary. It is hardly to be supposed that J. P. Buras, who employed Mr. Hawke to make this survey, was left in ignorance as to what was done. Even if he had not subsequently produced Hawke's map and *proces verbal,* it would have been reasonable to have assumed that Hawke showed him the boundary which he had been employed to establish. Upon the 2nd of February, 1867, the year following this survey, Jean Pierre, sold to Cyprien Buras a certain portion of the tract owned by him (as has been stated already), including that part which is supposed to lie contiguous to the Smith and Hove tract. The act of sale contains the following recital (referring to the lots which are sold): "And which all said lots, or sections, herein conveyed form a front of " forty arpents on the Mississippi river, *as the whole is set down on the* " *survey of said lands made by M. Hawke, civil engineer, on the 2nd* " *and 3rd of November, 1866, and hereunto annexed for reference.*" About two years later, in January, 1869, when William B. Booth brought the present action of boundary, Jean Pierre, and Cyprien Buras, who were made defendants, set up the Hawkes survey as correctly

establishing the boundary and prayed that it be so decreed. The plaintiff, however, objected, claiming that he would thereby be deprived of a mile front on the river.

It seems probable that the defendants were of the opinion that the plaintiff had not been sufficiently notified to enable them to insist upon their pretensions, and the court was relieved of the necessity of acting upon the Hawke survey by the fact that the parties agreed that a new survey should be made, and it was made accordingly by Sulakowski and McCulloh, surveyors, selected by the parties, respectively.

The peculiarity of the present situation lies in this: that the plaintiff now insists that the Hawke survey is substantially correct and should be adopted, whilst the defendant, Cprien Buras, who bought the land, owned by him, according to that survey, and who, in this suit, set up that survey as correctly establishing the boundary between his property and that of the plaintiff, and prayed that it should be so decreed, now undertakes to repudiate it, denies that he is in any way bound by it, and prays that it be disregarded by the court.

If the survey in question had come before the court on its merits, propounded by the defendants, and opposed by the plaintiff, and the court had decided that it was incorrect, and, for that reason, that it should not be held binding, the position of defendants' counsel might be tenable. But no such action was taken, and, whilst, in view of the fact that this survey was ignored by consent of the litigants, and others have been made, which it was contemplated should determine their rights, we are not disposed to hold that the defendant should be bound by the Hawke survey, as a judicial admission, nevertheless, the facts remain that the defendant bought his property according to the Hawke survey, and, two years afterwards, set up that survey in this suit as correctly limiting the property so acquired; and, apart from any question of estoppel, we have yet to be informed of any circumstances which deprive those facts of their value as evidence, showing that the Hawke survey embraces all the land owned by Cyprien Buras which is involved in this controversy; that he has always known that to be a fact, and has asserted it, and now asserts it, by his pleadings in this case, and that if, in establishing the boundary between his land and that of the plaintiff, the court accords to him the land thus surveyed, he will get all that he has purchased and all that he is asserting title to by his pleadings herein, and ought to have no just cause of complaint.

He opposes the last survey made, however, upon various grounds, and among them the following, to-wit:

"Fourth. That said survey is almost entirely based upon the former " survey of one Hawke, which survey was rejected by the court, has no " force and effect whatever, and no trace of which exists or could then " be located upon the property recently surveyed by the said C. Uncas " Lewis, surveyor."

The counsel for the defendant has fallen into an error in saying that the Hawke survey was rejected by the court, as appears from the statement of the case heretofore made. The court has never yet acted or been called upon to act upon it for the reason that it was regarded as *ex parte* and ignored by consent. The survey which is the subject of the opposition now under consideration is not obnoxious to that objection, and the mere fact, if fact it be, that it is a reproduction of the Hawke survey can afford no reason for its rejection.

The learned counsel has also fallen into an error in stating that no trace of the Hawke survey exists or could be located on the property at the date of the survey now under consideration. Waiving the testimony as to the present existence of certain posts, which are mentioned by the surveyor and one or more other witnesses as indicating the boundary as established by Mr. Hawke, we have the explicit testimony of the defendant, himself, given some twenty-three years ago, at a time when his memory had been kept refreshed by reason of the fact that this suit had not been allowed to drop, as was afterwards the case, and before his faculties had become impaired, as they are said now to be, by extreme old age. His testimony, so far as it is material to this point, reads as follows:

"Cyprien Buras, sworn for defendant, says: "I am sixty years of age, " was born in this parish and lived here all my life. I have been living " where I now reside for the last seventeen years. The line claimed by " the plaintiffs would take in my house and orange grove, according to " Sulacoski & McCulloh's survey. *Mr. Hawke put the two posts on my* " *upper line. I don't recollect (the date); it was when he made that* " *survey,*" etc.

Turning, now, to the *proces verbal* of Mr. Hawke in order to ascertain what he has to say about the "two posts" thus mentioned by the defendant, we find the following:

" * * * *Set a cypress post for the lower line of Smith and Hoves'* " *claim. On this line, S.54 W. set a second cypress post at 1. ch. 93 of* " *the first, to correspond to the lower front corner of said claim, as given* " *by Mr. Rightor, the tabling of my survey to this point being the same,*

" *south 194.49, and east 432.23, this line is the upper boundary of J. P.*
" *Buras land, and bears S. 54 W."*

As to the suggestion that the survey in question has no force and effect, we have already called attention to the fact that it is part of the only title which the plaintiff sets up, and that with full and accurate knowledge of the boundary established by it, *quoad* his property, and at a time when the matter was fresh in his memory, he solemnly asserted its correctness for the purposes of this case. It certainly is no fault of the defendant's that the plaintiff and the court did not, at that time, take him at his word, and if the position then assumed by him was correct, there is no reason why it should not constitute the basis of the judgment to be rendered now, since the most that we can hope to accomplish is to rest our conclusions upon correct premises.

As the boundary established by Hawke may, then, be considered as ascertained; and as the boundary thus established and ascertained forms an essential part of the title which the defendant exhibits, and by virtue of which he claims; and as it would be impossible, legally, to establish a boundary for defendant's property beyond the limits of that upon which his title is founded, it follows that, whilst the defendant's boundary might be established *within* the limits of Hawke's survey, it can, by no possibility, be established outside of those limits.

It will be observed that the title of the defendant does not call for plaintiff's tract as his upper boundary. He bought certain lots or sections, which are described as having together "a front of forty arpents " on the Mississippi river, *as the whole is set down in the survey of said* " *lands made by M. Hawke, civil engineer, on the 2nd and 3rd of* " *November, 1866, and hereunto annexed for reference."* Irrespective, therefore, of possible conflict with other titles, he cannot go beyond the limit of forty arpents front, within the Hawke survey, though if a stronger title were presented the forty arpents, to which he is thus apparently entitled, might be reduced or taken away entirely. In conclusion, upon this point, it may be said, however, that the defendant's title to the property claimed by him within the Hawke survey is not now assailed, and we find nothing in the record to impeach it. The assertion contained in the brief of the defendant's counsel that the defendant has only nineteen arpents front, undisputed, out of forty arpents purchased by him, we do not understand. There are some inconclusive admissions in the record as to the frontage sold and owned by the defendant, and it also appears that a good deal of testimony, offered for the purpose of showing that within the boundary

fixed by Hawke he has all the land purchased by him, was ruled out, on the objection of his counsel. We should certainly be unable to understand how the defendant could lose anything if his boundaries are established according to the survey by which he acquired.

Another question which presents itself is as to the boundary of the plaintiff's property, for it may happen, and in this case it does happen, that it is developed in an action of boundary that the property of the litigants is not contiguous. If, in such an action, the boundary of the defendant's land cannot be established beyond the limits called for by his title, the proposition is, at least, equally true as to the plaintiff. The question, then, is, where is the boundary of the plaintiff's land, as established by his title? It is understood that the northern, or upper, boundary is the Bayou Liard, which is well known; that the eastern boundary is the Mississippi river; that the western boundary is the prairie tremblante (the distance back from the river not being in controversy), and that the disputed question is as to the lower, or southern boundary.

The original order of the Governor General, the Baron de Carondelet, in favor of the plaintiff's author, Captain de St. Maxent, ordered the Surveyor General of the province to establish Captain de St. Maxent on certain lands fronting on the Mississippi river for "about two leagues, from Bayou Liards to that of Carencro." Under our law and jurisprudence, this was a grant *per aversionem*. C. C. 854, 2495; Nichols vs. Adams, 9 Ann. 117. The grantee was, therefore, entitled to take the land between the two bayous named as boundaries without regard to the lineal, or to the superficial, measurement, but he could take no more. And the confirmation, by the government of the United States, of the grant thus made by the Spanish Governor General, added nothing to that which had already been conferred. Nor did the subsequent issue of a patent for the fractional sections embraced in the original grant change the character of such grant, since the purpose, presumably, was to make the fractional sections conform to the original boundaries *per aversionem*. This seems to have been the view taken by this court when the case was before it in 1883, and we find no reason for adopting a different view at this time, since no reason has been suggested why this government should confirm the grantees in the ownership of more land than had been granted to them. And the maps which have been offered do not carry the conviction that the fractional sections delineated were intended to have any other boundaries than those designated in the

original grants, in confirmation of which patents for such sections were issued.

Upon the question of the identity, or location, of Bayou Carencro, named in the grant to plaintiff's author as the lower boundary of that grant, we find ourselves unable to concur in the conclusions reached by the surveyor and by our learned brother of the District court. A careful study of the record has convinced us that the bayou contemplated by the grant is that which appears upon the map as running from a point near the river directly into Bay Carencro (or Bay Carrion Crow, as on the U. S. Coast Chart), rather than that, further south, which, starting from a point somewhat further from the river, divides into two branches, one of which runs into Bay Carencro, and the other into Bay Hospital. We think that by far the preponderance of the oral testimony supports this view, that it is sustained by probability, considering the question from the point of view afforded by the maps (and particularly the government charts) when compared with the grant and the conditions surrounding it; and that it is sustained by circumstantial evidence indicating that the original plaintiff recognized the fact that the Bayou Carencro intended in the grant was the upper and not the lower bayou to which that name is now ascribed. We are satisfied that the upper bayou was at one time within an arpent or an arpent and a half of the river, and, at the date of the grant, was, no doubt, plainly visible from, if not connected with, the river; whereas, it does not appear that the lower bayou has ever been nearer than perhaps within eight or ten arpents of the river, and cannot, therefore, be supposed to have been considered a boundary for a tract of land fronting on the river and having only about three arpents in depth sufficiently out of water to be fit for cultivation.

We find that more than twenty years ago, upon the trial of the opposition to the Sulakowski & McCulloh survey, the original plaintiff and the surveyor testified that no Bayou Carencro could be found at the point at which they made their observations, and the survey then under consideration was apparently made upon the theory that the plaintiff would have all the superficial acreage and the mileage called for by his title. But we also find from a preponderance of testimony, and from circumstantial evidence, that a Bayou Carencro was in existence, as it had been in existence from the date of the grant to de St. Maxent; that it might have been found by a person deeply interested in finding it: and that an offer was made to point it out to the surveyors, who did not accept the offer.

We find further, in this connection, that the fact that the original plaintiff dropped the proceeding after the decision of this court upon the case as presented, in 1883, and upon the intimation that his acreage should be found between Bayou Liard and Bayou Carencro, and that he took no further steps in the matter during his life, though he lived for twelve years afterwards, is an indication that he had no good reason to suppose that the Bayou Carencro in question would be found as far down the river as he had been endeavoring to establish his lower boundary. And we think that as plaintiff was a resident of the neighborhood and owner of possibly the only tract of land in the world officially bounded on one side by Bayou Carencro, his opinion as to the probable location of that bayou is entitled to some consideration. We, therefore, conclude that the Bayou Carencro which constitutes the lower boundary of plaintiff's land is that bayou between Bay Carencro and the Mississippi river, which lies upon the line "I. E." upon the map drawn by C. Uncas Lewis, surveyor, June 9, 1899, and designated as map No. 7, in the book of maps forming part of the transcript in this case; that the land of the defendant does not lie contiguous to said bayou and boundary, and hence that no proper parties for the maintenance of an action of boundary are before the court.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and that there now be judgment rejecting the demands of both plaintiff and defendant, the costs of the appeal to be paid by the plaintiff, and the costs of the District Court to be borne by the parties in equal proportions.

Rehearing refused.